```
                UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF MISSOURI
                       EASTERN DIVISION


UNITED STATES OF AMERICA,       )
                                )
          Plaintiff,            )
                                )
     v.                         )    No. 4:08 CR 287 CEJ
                                )                    DDN
ROBERT H. BANKS,                )
                                )
          Defendant.            )
```

### ORDER AND RECOMMENDATION
### OF UNITED STATES MAGISTRATE JUDGE

This action is before the court upon the pretrial motions of the parties which were referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b). An evidentiary hearing was held on July 29, 2008.

### Motion to dismiss

Defendant Banks is charged with four counts of possessing child pornography in violation of 18 U.S.C. § 2252A(a)(5)(B).[1] He has moved to dismiss the indictment because two specifications of the definition of the term "child pornography" contained in § 2252A(a)(5)(B) are unconstitutionally vague and overbroad, fail to inform the defendant of the nature of the prohibited offense, subject him to double jeopardy, and violate the First Amendment's right to free speech and expression. The

---

[1]   Section 2252A(a)(5)(B) provides:
Any person who--
                        * * *
knowingly possesses any book, magazine, periodical, film, videotape, computer disk, or any other material that contains an image of child pornography that has been mailed, or shipped or transported in interstate or foreign commerce by any mens, including by computer, or that was produced using materials that have been mailed, or shipped or transported in interstate or foreign commerce by any means, including by computer . . . shall be punished . . . .

18 U.S.C. § 2252A(a)(5)(B).

two specifications of "Child pornography" referenced by defendant, as defined by Congress are:

> "child pornography" means any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical, or other means, of sexually explicit conduct, where--
>
>> (A) the production of such visual depiction involves the use of a minor engaging in sexually explicit conduct; [or]
>>
>> * * *
>>
>> (C) such visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaging in sexually explicit conduct.

18 U.S.C. § 2256(8)(A), (D)(2003). Only these two specifications of the definition of "child pornography" are set out in the indictment. (Indictment at 2.)

The undersigned concludes that the two referenced statutory specifications of the definition of "child pornography" are not unconstitutionally vague and do not violate defendant's right to freedom of speech and expression under the First Amendment.

The Supreme Court has ruled that the First Amendment does not bar the government from criminalizing pornography produced with real children. Ashcroft v. Free Speech Coalition, 535 U.S. 234, 245-46 (2002). This approval applies to § 2256(8)(A), because by its express language it applies to the production of child pornography using actual minor children.

In Ashcroft, the Court held that the language of § 2256(8)(B)[2] before it, banning virtual child pornography, involving the production of child pornography without the use of actual minors, is overbroad and

---

[2] The subject language of § 2256(8)(B) before the Supreme Court was described as prohibiting "'any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture' that 'is, or appears to be, of a minor engaging in sexually explicit conduct." 535 U.S. at 241.

a violation of the First Amendment.  535 U.S. at 256.  The language of § 2256(8)(B), however is not before at issue in this action.

In <u>United States v. Bach</u>, 400 F.3d 622, 632 (8th Cir. 2005), <u>cert. denied</u>, 546 U.S. 901 (2005), the Court of Appeals held that the involvement of the image of a real identifiable minor involved a compelling interest of the government in protecting the minor's physical and psychological well being.  Such images can be constitutionally prosecuted under <u>Ashcroft</u>.  400 F.3d at 632.  On its face, this definition of "child pornography" does not contravene the First Amendment.  Any argument that the statute is unconstitutional as it is applied must await assessment of the government's evidence at trial.  <u>Id. See also</u> <u>United States v. Wolk</u>, 337 F.3d 997, 1004-05 (8th Cir. 2003).

Similarly, defendant's arguments that the application of the statute, under the allegations in the indictment, contravene defendant's rights to due process, fair notice of the charge against him, and not being subjected to double jeopardy, must await an analysis of the circumstances of trial.

The motion to dismiss the indictment should be denied.

**Motion for pretrial discovery**

Defendant has moved for pretrial discovery of information and evidence.  The record indicates that the government has disclosed a substantial amount of information and has not refused to disclose any information.  (Doc. 15 at ¶ 14.)  Nothing more was presented at the pretrial hearing.  Therefore, the motion will be denied as moot.

**Motions to suppress evidence**

Defendant Robert H. Banks has moved to suppress his statements (Docs. 10, 17) and the physical evidence seized in the execution of a search warrant (Doc. 18). From the evidence adduced at the hearing, the undersigned makes the following findings of fact and conclusions of law:

**FACTS**

1. On June 5, 2005, federal Immigration and Customs Enforcement (ICE) Special Agents James Hamby and John Taylor went to 12453 Meadow Green Place in Creve Coeur, Missouri, the residence of Robert H. Banks. The agents were investigating activities involving child pornography related to incidents that occurred in 2002 and 2003. The agents identified themselves to Banks, but before they could explain why they were there, Banks said he had to leave and did not have time to speak. Agent Hamby asked Banks to call him to set up an appointment that would be mutually convenient.

2. Before the agents left Banks's neighborhood, Banks called them back and asked why the agents had contacted him. Agent Hamby explained the reason for the contact being an investigation of him regarding child pornography. Before the agent could continue, Banks said he had to leave because he was late to pick up his car that was being serviced. In response to Agent Hamby's explanation, Banks said that he had been the victim of fraud involving three separate credit card accounts in the past. He also stated that he made frequent purchases on the Internet, and attributed this use of the Internet as the source of unspecified fraudulent charges credited to his accounts. Agent Hamby then gave Banks his business card and asked him to call to set up an appointment at Banks's convenience. An hour or two later, an attorney telephoned Agent Hamby and said he represented Banks. The attorney told the agent he had advised Banks not to consent to an interview. Agent Hamby agreed not to pursue any further voluntary contacts with the defendant.

3. On August 31, 2007, Agent Hamby applied for a search warrant from Magistrate Judge Thomas C. Mummert, III. The application sought a warrant to search 12453 Meadow Green Place and all computer and digital media there for items relating to child pornography. In support of his

application, Agent Hamby submitted his written, sworn affidavit. In his affidavit, Agent Hamby described his extensive training in the investigation of crimes related to child pornography and the use of the Internet for such purposes. The affidavit described the operation of digital computer equipment in the operation of child pornography activities, generally. (Gov. Ex. 1 Affidavit at 1-10.)

4. The affidavit then described an investigation ICE Cyber Crimes Center "initiated" in April 2006, known as "Project Flicker." The target of the investigation was a commercial child pornography website known as "Home Enterprise," originally known as "Home Collection." The investigation determined that the website offered individuals monthly access to restricted websites, that provided images of child pornography, for a specific fee. The affidavit described how ICE investigators obtained undercover access to such websites and observed images of child pornography. The physical location of one of the websites was determined to be Genesis2 Networks in Charlotte, North Carolina. (Id. at 10-16.)

5. The affidavit described the execution of a search warrant on Genesis 2 Networks. Among the items seized was a computer hard drive that held the "Home Collection" website. In the seized data was information about customers who used the PayPal system to pay for access to the member-restricted child pornography website. (Id. at 16-18.) The affidavit then described information obtained from the PayPal system. From this information, the investigating agents learned and included in the affidavit that on October 3, 2006, Robert H. Banks paid $79.95 for 30 days access from email address "feeins@aol.com" to a Home Collection member-restricted website known as "Desired Angels." The investigators determined that this website contained many images of child pornography. On October 13, 2006, Banks paid $79.95 for 30 days access by the same email address to the same website. (Id. at 17-22.)

6. The affidavit stated that in August 2007, the investigating agent issued a summons to AOL for information about the subscriber to email account feeins@aol.com. AOL responded that the account belonged to Robert Banks at 12453 Meadow Green Place, Creve Coeur, Missouri 63141. Other investigation confirmed that this address was the residence of Banks. (Id. at 22-25.)

7. The affidavit described the ICE investigation of Banks in 2003, which resulted in the identification of Banks's use of a credit card to subscribe to websites that contained child pornography. The transactions occurred on October 17, 2002, April 21, 2003, May 8, 2003, and June 12, 2003. Further investigation in January and February 2005 confirmed that Banks resided at 12453 Meadow Green Place. (Id. 26-27.)

8. The affidavit described the visit that Agents Hamby and Taylor made to Banks's residence on June 2, 2005,[3] their brief conversation with him, Agent Hamby's giving him his business card for a follow-up contact because Banks did not then have time to speak with the agents, Banks's contacting them before they left the neighborhood and asking why they were there, the agents explaining the nature of the investigation to him, and Banks's reply that he had been the victim of the fraudulent use of his credit card. The affidavit described the telephone call to the agents at 3:45 p.m. from someone who purported to be a lawyer (who identified himself as Larry Permuter) who represented Banks, that the lawyer said he would advise Banks not to voluntarily consent to an interview about that matter, and that Agent Hamby told the lawyer he would not pursue any further contacts with Banks. (Id. at 27-28.)

9. The affidavit described the agent's investigation of Banks's suggestion that he had been the victim of the fraudulent use of his credit card. In response to a grand jury subpoena issued on "August 27, 2008"[4] to the bank that issued the credit card with the account used in the transactions on October 17, 2002, April 21, 2003, May 8, 2003, and June 12, 2003, the agent learned that there were no merchandise returned credits on that account. (Id. at 28-30.)

10. The rest of the affidavit described the known characteristics of persons who collect child pornography and manner in which any seized computer devices would be searched. (Id. at 30-34.)

---

[3]The hearing testimony was that this visit occurred on June 5, 2005. The difference between June 2 and June 5 is not relevant to the outcome of the suppression issues raised by the defendant's motion.

[4]The undersigned believes "2008" was a typographical error for "2007."

11. On August 31, 2007, at 9:15 a.m., Judge Mummert issued the search warrant for 12453 Meadow Green Place. (Id. Search Warrant.)

12. On September 5, 2007, at approximately 7:30 a.m., a total of seven ICE agents, and two Creve Coeur Police Officers, went to the residence at 12453 Meadow Green Place in Creve Coeur to execute the search warrant. Agent Hamby went to the front entrance of the residence. There he saw a front glass storm door through which he could see that the front door was open. He rang the doorbell but the bell did not ring. So, he opened the glass storm door, knocked on the inside door, and announced himself. At that time Banks walked around the front corner of the house to meet the agents.

13. Agent Hamby motioned to Banks to continue walking toward him. Agent Hamby identified himself as an agent and told him they had a search warrant, which they would be executing, for computer equipment in the house. At that time Banks said his wife had a computer upstairs and that he had a computer downstairs. Agent Hamby and Agent Quinn stood by Banks at the threshold of the house as the other agents entered the residence. Out of concern for his and the other agents' safety, Agent Hamby asked Banks whether there was any other person in the house. Banks said he was expecting his wife to arrive at any time. No one else was in the house.

14. Then, Agent Hamby took Banks into the living room. As he did so, Agent Hamby saw that the residence contained a large number of firearms in open view. He saw some in a case with a glass door behind the couch in the living room. He saw other firearms free-standing near the fireplace. When he saw these firearms, Agent Hamby asked Banks to remain near him and one of the Creve Coeur officers in the living room at all times while the residence was being secured by the other officers. Agent Hamby told the defendant he was not under arrest, and he was free to go about his business as soon as the officers secured the residence.

15. After the agents secured the residence, Agent Hamby went outside to retrieve the search warrant so that he could explain in greater detail what the search was about. After Agent Hamby returned inside, an agent informed him that firearms were located all over the house. Agent Hamby went back outside and telephoned the office of the federal Bureau of Alcohol, Tobacco, Firearms, and Explosives to discuss

the firearms situation inside the house.  At that time, Agent Hamby saw Mrs. Banks arrive.  He went and greeted her, identified himself, and explained about the execution of the search warrant.  He then escorted her inside the residence and had her seated on the couch with the agent and her husband.  At that time, Agent Hamby again said that no one was under arrest, that they were free to go, but that due to the presence of firearms, he wanted an officer near them if they remained in the residence.

16.  Agent Hamby introduced Agent Quinn to Mr. Banks as the on-site computer forensic investigator.  Agent Quinn asked Banks a few generic questions about his computers and operating system.  Agent Quinn then asked if Banks would like to go downstairs to talk more privately.  Banks agreed to go downstairs and he, Agent Hamby, Agent Quinn, and one Creve Coeur Police Officer proceeded downstairs.

17.  Downstairs, Agent Quinn explained to Banks that they were there to investigate evidence of child pornography, that he was not under arrest, and that he was under no obligation to answer questions.  Banks said he understood, and Agent Quinn proceeded with the interview.  Agent Quinn asked questions about the collection, use, and purchase of child pornography.

18.  After the interview, Agent Hamby told the defendant he was free to go if he needed to leave.  However, he was told that, if he remained in the house, he had to have an officer with him.  Banks did not object to this limitation.

19.  Thereafter, the officers and agents continued and completed the systematic search of the residence.

20.  During the search, Banks was free to use the telephone and did so.  Around 10:30 a.m., Banks called his attorney.  Agent Hamby spoke to the attorney, and the attorney asked Agent Hamby not to pursue any more questioning of Banks.  At that time, Agent Hamby announced to the other agents and officers that Banks had invoked his right to counsel.

21.  During execution of search warrant, the Creve Coeur Police Department discovered suspected controlled substances, believed to be marijuana.  After the federal agents completed the execution of the search warrant, the Creve Coeur officers took Banks into custody on Creve

Coeur city charges.  Also, in the interest of public safety, the Creve Coeur officers collected and took custody of the weapons found in the house and kept them for safekeeping.

22.   During the entire time the agents and officers were at Banks's house, Banks did not appear to be under the influence of drugs or alcohol.  No promises or threats were made to Banks, and no weapons were drawn, in an effort to get him to cooperate with the officers.

### **DISCUSSION**
#### 2007 Search Warrant

Defendant moves to suppress the physical evidence seized from his residence during the execution of the search warrant on September 5, 2007.  (Doc. 18.)  Defendant argues that the search warrant was not lawfully issued.  The issue before this court when reviewing the validity of the issuance of a search warrant is whether the supporting materials gave the issuing judge a substantial basis for concluding that probable cause existed for the issuance of the warrant.  United States v. Luloff, 15 F.3d 763, 768 (8th Cir. 1994); United States v. Peterson, 867 F.2d 1110, 1113 (8th Cir. 1989); United States v. Martin, 866 F.2d 972, 976 (8th Cir. 1989) (citing Illinois v. Gates, 462 U.S. 213, 238-39 (1983)).  Probable cause means a "fair probability that . . . evidence of a crime will be found in a particular place," given the circumstances set forth in the affidavit.  United States v. Horn, 187 F.3d 781, 785 (8th Cir. 1999).

The search warrant issued on August 31, 2006 was supported by an affidavit that provided a substantial basis for finding probable cause. The affidavit submitted to Judge Mummert provided a logical chain of information that indicated that the computer and related items inside 12453 Meadow Green Place contained evidence of child pornography.  The main links in this chain of facts are the records described in the affidavit which indicated Banks's subscription to the AOL account in August 2007 that was linked to two accesses to the subject child pornography websites (Affidavit ¶ 44) and the uses of PayPal in October 2006 to pay for the subscription to the member-restricted "Home Collection" website which was known in April 2006 by the investigators

to contain images of child pornography.  The information in the affidavit was sufficient to provide a basis for a finding of probable cause.  Cf., United States v. Bach, 400 F.3d 622, 627-28 (8th Cir. 2005), cert. denied, 546 U.S. 901 (2005).

### Stale information

Defendant argues that the affidavit's information about the purchases of subscriptions to known child pornography websites in 2002 and 2003 was stale information.  The undersigned agrees that, if this information stood alone, it might be considered legally stale, i.e. not sufficiently close in time to the issuance of the search warrant in 2007 to indicate a reasonable likelihood that the sought evidence would be at the location when the warrant would be executed.  However, this information is not alone in the affidavit, but merely provides a background context for the 2006-2007 investigation.  The court must look to the totality of the circumstances stated in the affidavit.  United States v. Howard, 532 F.3d 755, 759 n.5 (8th Cir. 2008).  Having considered all of the information in the 2007 search warrant affidavit, the undersigned concludes that it provided the issuing judge a substantial basis for finding probable cause.

### No identifiable minor

Defendant also argues that the portions of the affidavit that refer to purchases of child pornography on October 3 and 13, 2006, are legally insufficient to support a finding of probable cause, because the affidavit states that the investigators were unable to verify that the images were of identifiable children.  Therefore, he argues, there was no probable cause for the issuance of the warrant.  The argument is without merit.

The search warrant affidavit states that on October 3 and 13, 2006, the investigators determined that Banks made payments to PayPal for access to the child pornographic website known as "Desired Angels" which was identified by the name "HomeCollection 1001."  The agents determined that this website contained 9,076 image files and 119 video files.  In these files were hundreds of images of the displays of female minors'

genitalia and many female minors were seen to be displayed in sexually suggestive ways. However, the agents and other investigators to whom the images were submitted for analyses were "unable to match any of the images with known victims."

The issuing judge's finding of probable cause was correct even though the affidavit stated that the relevant images of minors could not be matched with known victims. The Congressional definition of "child pornography" includes images of "identifiable minors" only as an alternative specification of child pornography that is prohibited by the law and which can be the subject of a federal search warrant. Further, actionable evidence of child pornography involving identifiable minors does not require an indication of the actual identity of the identifiable minor as that of a known person. See 18 U.S.C. § 2256(8)[5], § 2256(9).[6]

### Defendant's statements on September 5, 2007

Defendant argues that his statements to investigators on September 5, 2007, during the execution of the search warrant should be suppressed. He argues that the statements were made in violation of his rights under Miranda v. Arizona, 384 U.S. 436 (1966), the statements were involuntary,

---

[5] See relevant statutory definition of "child pornography" quoted at page 2, above.

[6] Congress defined "identifiable minor" thus:

(A)  means a person--
     (i)  (I) who was a minor at the time the visual depiction was created, adapted, or modified; or
          (II) whose image as a minor was used in creating, adapting, or modifying the visual depiction; and
     (ii) who is recognizable as an actual person by the person's face, likeness, or other distinguishing characteristic, such as a unique birthmark or other recognizable feature; **and**
**(B)  shall not be construed to require proof of the actual identity of the identifiable minor.**

18 U.S.C. § 2256(9)(emphasis added).

and the statements were made in response to questioning following the invocation of his right to counsel in 2005.

The Fifth Amendment to the federal Constitution protects an individual from being compelled to be a witness against himself. U.S. Const. amend. V. To safeguard an individual's Fifth Amendment rights, a suspect in custody must be warned, before being interrogated, that he has the right to remain silent and that any statement he makes may be used against him. Miranda, 384 U.S. at 444. In Miranda, the Supreme Court concluded that the inherently coercive nature of custodial interrogations blurred the line between voluntary and involuntary statements, heightening the risk that an individual would be deprived of the Fifth Amendment's protections. Dickerson v. United States, 530 U.S. 428, 435 (2000).

Procedural safeguards were described in Miranda to be applied to persons who are subjected to interrogation while in custody. Oregon v. Mathiason, 429 U.S. 492, 494-495 (1977) (per curiam). The simple fact that an investigation has focused on a particular suspect does not implicate Miranda if the settings are noncustodial. Minnesota v. Murphy, 465 U.S. 420, 431 (1984).

An interrogation, under Miranda, includes not only express questioning, but any words or actions by law enforcement reasonably likely to elicit an incriminating response from the suspect. Rhode Island v. Innis, 446 U.S. 291, 301 (1980). An incriminating response is any response, be it inculpatory or exculpatory, that the prosecution might seek to introduce at trial. Id. at 301 n.5. In this case, the interview with defendant on September 5, 2007 was clearly an interrogation. The court must determine whether the interrogation occurred when defendant was in custody for Miranda purposes.

An individual is in custody if he has been formally arrested or if his freedom of movement has been restricted to a degree associated with a formal arrest. California v. Beheler, 463 U.S. 1121, 1125 (1983). In determining the question of custody, the court first looks to the circumstances surrounding the interrogation. Thompson v. Keohane, 516 U.S. 99, 112 (1995). Given those circumstances, the court then asks whether a reasonable person would have felt at liberty to terminate the

interrogation and leave.  Id.  The critical inquiry centers on whether the person's freedom to depart was restricted in any way.  Mathiason, 429 U.S. at 495; United States v. LeBrun, 363 F.3d 715, 720 (8th Cir. 2004) (en banc).  In making this inquiry, the court looks to the totality of the circumstances from an objective viewpoint, and not the subjective views of either the suspect or the officers.  Stansbury v. California, 511 U.S. 318, 322-23 (1994); LeBrun, 363 F.3d at 720.

The Eighth Circuit has developed a series of factors to help determine when an individual is in custody.  United States v. Griffin, 922 F.2d 1343, 1349 (8th Cir. 1990).  These factors include: (1) whether the officer informed the suspect that the questioning was voluntary and the suspect was free to leave; (2) whether the suspect's freedom of movement was restrained during the questioning; (3) whether the suspect initiated contact with the authorities, or simply agreed to answer questions; (4) whether the officers employed strong-arm tactics or deceptive tactics during the questioning; (5) whether the atmosphere of the questioning was police-dominated; and (6) whether the officers placed the suspect under arrest at the end of the questioning.  Id.  These six factors are intended to be representative, rather than exclusive.  United States v. Axsom, 289 F.3d 496, 501 (8th Cir. 2002).  There is no requirement "that the Griffin analysis be followed ritualistically in every Miranda case."  United States v. Czichray, 378 F.3d 822, 827 (8th Cir. 2004).  Indeed, in LeBrun, the Eighth Circuit decided, en banc, a custody question without ever mentioning Griffin.  Id.  Whether the six factors are consulted or not, the "ultimate inquiry must always be whether the defendant was restrained as though he were under formal arrest."  Id. at 828.

The undersigned concludes that the Griffin factors are relevant to the facts before the court.

After the officers arrived at defendant's home on September 5, 2007, they identified themselves as law enforcement and explained to him that they were there to execute a search warrant.  After he and the officers entered the house with defendant, Agent Hamby told defendant he was not under arrest and that he was free to leave.  He repeated this statement to defendant and his wife after she arrived and entered the home.

Shortly thereafter, Agent Quinn told defendant he was not under arrest and did not have to answer his questions. After defendant was returned upstairs, Agent Hamby told defendant he was free to leave the house. Applying the first Griffin factor, defendant was not in custody at the time of the first interview. See Griffin, 922 F.2d at 1349 ("The most obvious and effective means of demonstrating that a suspect has not been taken into custody . . . is for the police to inform the suspect that an arrest is not being made and that the suspect may terminate the interview at will.").

The second factor, regarding restraint during interrogation, also supports finding defendant was not in custody during the execution of the federal search warrant. Defendant knew he could leave the residence at any time. Due to the reasonable caution the agents and officers were taking for their and everyone's protection because of the large number of firearms in open view, defendant accepted the fact that, if he remained in the house where the weapons were located, he would be kept near an officer. Also, defendant agreed to go downstairs with Agent Quinn to talk privately.

The third factor, whether defendant initiated the contact with the officers or just acquiesced in the interview supports defendant, because he did not initiate contact with the officers on that day.

The fourth factor, whether the officers used strong-arm tactics or deceptive strategy in the interrogation supports finding that defendant was not in custody when he was interviewed. The officers did not employ any strong-arm or coercive tactics during the time the search warrant was being executed and during the time defendant was interviewed.

The fifth Griffin factor, whether the atmosphere was police-dominated, is neutral regarding a determination of whether defendant was in custody. The nine, and later more, law enforcement officers who entered defendant's home took control of the premises, especially when the many firearms were seen. However, this dominance of the premises was in large part not specifically directed at defendant personally. He knew they were there irrespective of his presence. He knew they were there primarily to execute the search warrant and that any close observation of him had to do with the mny firearms. His understanding of the need

for their presence, especially when he was so frequently told he was not under arrest and was told he could leave, ameliorated the otherwise obvious police presence. Towards the end, after defendant's counsel asked Agent Hamby not to further question defendant, the agent announced this fact to the other officers to be sure defendant was not further questioned. In addition, the interview occurred at defendant's residence. "When a person is questioned 'on his own turf,' [courts] have observed repeatedly that the surroundings are not indicative of the type of inherently coercive setting that normally accompanies a custodial interrogation." Czichray, 378 F.3d at 826; see also Axsom, 289 F.3d at 502 ("When a suspect is interrogated in the comfort and familiarity of his home, a court is less likely to find the circumstances custodial.").

Since the federal agents did not place defendant under arrest at the conclusion of the execution of the search warrant, and because it was the probable cause basis for the search warrant that defendant was interviewed about, the sixth Griffin factor supports finding that defendant was not in custody for the purposes of the interrogation. See United States v. Galceran, 301 F.3d 927, 931 (8th Cir. 2002) (the absence of an arrest is a very important factor weighing against custody). Defendant's arrest after the conclusion of the search warrant execution was occasioned by the local police taking him into custody on local charges unrelated to the search warrant and the interrogation.

In light of the six Griffin factors, the undersigned concludes that defendant was not in custody for Miranda purposes. The requirement that he be advised of his Miranda rights did not attach during the interview at his home on September 5, 2007.

Further, defendant's statements on September 5, 2007, were voluntary. A statement is constitutionally involuntary when it was induced by the interrogating officers by threats, violence, or express or implied promises sufficient to overcome the defendant's will and to critically impair his capacity for self-determination. LeBrun, 363 F.3d at 724. Whether a confession is involuntary is judged by the totality of the circumstances, but with a focus on the conduct of the officers and the characteristics of the accused. Id. The government bears the burden

of proving the challenged statements were voluntary by a preponderance of the evidence.  <u>Id.</u>

In this case, at no time did the officers threaten or yell at defendant on September 5, 2007.  The officers never made any false promises to him.  Defendant was not under the influence of drugs or alcohol.  His ability to not cooperate with the officers and answer questions was never overborne.  Under the totality of the circumstances, defendant's statements were voluntary.

<u>Invocation of right to counsel</u>

Defendant argues that his invocation of his right to counsel at any interrogation on June 5, 2005, was violated when he was interrogated on September 5, 2007.  The government argues that the agents were engaged in two entirely different investigations on those days and that the invocation of the right to counsel in 2005 did not apply to the questioning in 2007.  The government argues that the investigations were different because the 2005 investigation involved purchases of subscriptions to access to child pornography in 2002 and 2003 and the 2007 investigation was based on other facts.

Considering the evidence adduced at the hearing and the information set forth in the search warrant affidavit, the undersigned does not find as a matter of fact that, for the purposes of analyzing the legal significance of defendant's 2005 invocation of his right to counsel, the agents were involved in two entirely different investigations in 2005 and 2007.  However, such a finding is not determinative of defendant's argument that he was unlawfully interrogated on September 5, 2007.

There is no dispute that in 2005, defendant's counsel, on defendant's behalf on June 5, 2005, advised Agent Hamby that he represented defendant and that he had advised defendant not to consent to an interview.  Agent Hamby understood this to be an invocation of defendant's right to counsel and stated he would not further contact defendant.  The agent described in the 2007 search warrant his understanding of counsel's 2005 statement.  (Gov. Ex. 1 at ¶ 67.)

Under <u>Edwards v. Arizona</u>, 451 U.S. 477 (1981), generally, after the right to counsel is clearly invoked by a person, law enforcement may not

thereafter question the person until counsel has been made available to him, unless the defendant initiates further communication with law enforcement. 451 U.S. at 484-85.

In <u>Minnick v. Mississippi</u>, 498 U.S. 146 (1990), the Supreme Court ruled that the protection afforded by the court's ruling in <u>Edwards</u> did not end once the suspect consulted with counsel. Rather, the court held, "when counsel is requested, interrogation must cease, and officials may not reinitiate interrogation without counsel present, whether or not the accused has consulted with his attorney." 498 U.S. at 153. This is the case even when the second interrogation occurs during the course of a separate, unrelated investigation. <u>Arizona v. Roberson</u>, 486 U.S. 675 (1988).

Two cardinal factors, however, distinguish the facts of this case from the rule of <u>Edwards v. Arizona</u>. First is the fact that a substantial period of time passed between the invocation of the right to counsel in 2005 and the interrogation in 2007, and the second fact is that between the time defendant invoked his right to counsel in 2005 and the interrogation in his home in 2007 he was not in custody.

In <u>United States v. Arrington</u>, 215 F.3d 855 (8th Cir. 2000), the defendant had been arrested when he requested counsel after being advised of his <u>Miranda</u> rights. He pled guilty to the state crime of fleeing from police and was a sentenced prisoner when he was interviewed by a federal agent investigating a felon in possession charge. In that case, the Eighth Circuit ruled:

> Although the Fifth Amendment right to counsel continues through the duration of police custody, we find no support in *Edwards* or *Roberson* for Arrington's contention that the right also "continu[es] *ad infinium*," and certainly not where, as here, the accused has entered a guilty plea and has begun serving his sentence. . . . After pleading guilty to the state flight charge, Arrington was transferred from police custody to correctional custody to serve his sentence. At that point, Arrington was no longer "'in custody' as that term has been used in the context of *Edwards and Roberson*," and *Edwards* and *Roberson* were no longer applicable as a basis for suppressing Arrington's statement to the AFT agent.

215 F.3d at 856-57 (internal citations omitted).

United States v. Harris, 221 F.3d 1048 (8th Cir. 2000), is more like the case at bar. In February 1999 FBI agents interviewed Harris to determine whether he had set fire to his own church. Harris agreed to meet the agents at the local sheriff's office and did so. Harris was told he was not in custody and could leave at any time. Harris submitted to a polygraph test, which he flunked, and he submitted to two hours of questioning, before he said he wanted to see a lawyer. Harris then left the sheriff's office and returned home. An agent contacted Harris by telephone three hours later and Harris agreed to meet with the agents again the next day. Again, Harris met the agents at the sheriff's office, did not have a lawyer, was not read his Miranda rights, and confessed to burning the church. 221 F.3d at 1049-50.

The Eighth Circuit affirmed Harris's conviction. It held:

> "*Edwards* thus established another prophylactic rule designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights." Michigan v. Harvey, 494 U.S. 344, 350 (1990). Concern that a suspect will be "badgered" is greatest when a suspect remains in confinement from the time he requests a lawyer until the time that police attempt to reinterrogate him. That concern is not present in cases such as this, however, where a person is not in continuous custody and the coercive effects of confinement dissolve.
>
> * * *
>
> Harris was not in continuous custody between the time he requested a lawyer on February 4 and the time he was reinterrogated on February 5. . . . In light of the circumstances of this case, we conclude that a three-hour break in time [between the time Harris left the sheriff's office and the time the agent telephoned him to arrange for the interview on the following day] defeats *Edwards* protection, since Harris had ample opportunity to consult his family, friends, or a lawyer. . . . Since Harris did not remain in custody, but was permitted to return home, *Edwards* does not bar introduction of his subsequent confession.

221 F.3d at 1052-53 (internal citations omitted).

In the case at bar, when defendant, through counsel, invoked his right to counsel when dealing with the agent in 2005, he was not in custody, nor was he subjected to custodial interrogation 16 months later when the search warrant was executed at his residence. Whether or not

- 18 -

the agents were investigating the same facts in 2007 that they were investigating in 2005, as the government argues, the lack of custodial status, the passage of a substantial period of time, the repeated advice to defendant that he did not have to answer their questions and could leave at any time, and the voluntary nature of his statements in 2007 acted to dissipate the *Edwards* rule prohibiting further interrogation without the presence of counsel unless it was initiated by the defendant.

For these reasons,

**IT IS HEREBY ORDERED** that the motions of defendant Robert H. Banks for discovery under Rule 16 (Docs. 15, 19) be denied.

**IT IS HEREBY RECOMMENDED** that the motions of defendant Robert H. Banks to suppress evidence (Docs. 10, 17, 18) be denied.

**IT IS FURTHER RECOMMENDED** that the motion of defendant to dismiss the indictment (Doc. 14) be denied.

The parties are advised they may have until September 15, 2008, to file written objections to this Order and Recommendation. The failure to file timely, written objections may waive the right to appeal issues of fact.

                                    /S/   David D. Noce
                             UNITED STATES MAGISTRATE JUDGE

Signed on August 29, 2008.